This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO,**

   Plaintiff-Appellee,

v.                                                             **NO. 33,525**

**ANTONIO HERNANDEZ,**

   Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY**
**Fernando R. Macias, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
Jacqueline R. Medina, Assistant Attorney General
Albuquerque, NM

for Appellee

Jorge A. Alvarado, Chief Public Defender
Kathleen T. Baldridge, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**MEMORANDUM OPINION**

**VANZI, Judge.**

{1} Defendant Antonio Hernandez appeals his convictions for one count of criminal sexual penetration of a minor (CSPM) and four counts of criminal sexual contact of a minor (CSCM). He argues that (1) the State failed to establish beyond a reasonable doubt that Defendant committed the crimes against a minor under the age of thirteen (Victim); and (2) his convictions violate the state and federal guarantees against double jeopardy. We affirm in part and reverse in part. Because this is a memorandum opinion and because the parties are familiar with the case, we reserve discussion of the facts for our analysis of the issues on appeal.

**DISCUSSION**

**Sufficiency of the Evidence**

{2} On appeal, Defendant contends that there was insufficient evidence presented to prove that he committed any of the crimes against Victim. In order to convict Defendant of CSPM, the State had to prove the following beyond a reasonable doubt: Defendant caused the insertion, to any extent, of a finger into the vagina of Victim, a child under the age of thirteen. UJI 14-957 NMRA; NMSA 1978, § 30-9-11(D)(1) (2009). To convict him of second and third degree CSCM, the State was required to prove beyond a reasonable doubt that Defendant touched or applied force to the unclothed vulva and buttocks and clothed vulva and buttocks of Victim, a child under the age of thirteen. UJI 14-925 NMRA; NMSA 1978, § 30-9-13(B)(1), (C)(1) (2003). The standard of review for sufficiency of the evidence is highly deferential. *State v.*

*Dowling*, 2011-NMSC-016, ¶ 20, 150 N.M. 110, 257 P.3d 930. When undertaking such an analysis, we "determine whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *Id.* (internal quotation marks and citation omitted). In doing so, we "view the evidence in the light most favorable to the State, resolving all conflicts and indulging all permissible inferences in favor of the verdict." *State v. Reed*, 2005-NMSC-031, ¶ 14, 138 N.M. 365, 120 P.3d 447. "We do not substitute our judgment for that of the factfinder concerning the credibility of witnesses or the weight to be given their testimony." *State v. Haskins*, 2008-NMCA-086, ¶ 8, 144 N.M. 287, 186 P.3d 916.

{3} The evidence at trial was as follows. Victim testified that the incident at issue took place in April 2010, when she was eleven years old and in the fifth grade. At that time, Defendant and his wife were in the process of getting a divorce, and Defendant was living at his sister Elaine's house in Las Cruces, New Mexico. Victim and her two younger sisters visited Defendant at Elaine's home every other weekend and sometimes on holidays. Most of the time when they were there, Victim and her sisters would sleep in a room with bunk beds, and Defendant slept in a room across the hall from them, although Victim testified that she had slept in the same bed as Defendant once or twice.

{4}     On Friday, April 16, 2010, Victim's mother dropped Victim and her sisters off to spend the weekend with Defendant. That evening, Victim, her sisters, and Defendant stayed in the living room and watched television and then went to bed. Victim slept with her sisters in the bunk beds. The next evening, April 17, 2010, Defendant rented a movie that he watched with Victim and her sisters. When the movie was over, Defendant asked which of them wanted to sleep with him that night, and Victim said that she would. Defendant sent Victim's sisters to bed and then watched music videos with Victim in the computer room. Victim went to bed with Defendant after watching the videos. Like Defendant, she was wearing a t-shirt and pajama pants.

{5}     At some point during the night—between 1:00 a.m. and 3:00 a.m.—Victim was asleep on her stomach and woke up with Defendant's hand in her pants. Victim testified that Defendant was rubbing her "back and forth" on her vagina and bottom. Because she was scared, Victim stayed quiet so Defendant would not know that she was awake. Then Defendant "stuck his finger up [Victim's] vagina" and after he pulled it out, she flinched. Defendant took his hand out of Victim's pants, and she closed her legs hoping that Defendant would stop. Throughout, she tried not to let him know that she was awake.

{6}     Although she had her legs closed, Defendant pried them open with his hands and pulled Victim's pants down. He started rubbing her vagina and bottom back and

4

forth again and kissed her buttocks. Victim felt Defendant's lips and the bristle on his chin on her buttocks when he kissed her. Defendant "finished . . . rubbing" Victim and then pulled her pants back up. Victim shook and told Defendant that she had had a nightmare and needed to use the rest room. She spent about five minutes in the restroom crying and wondering what to do. She considered calling her mother but did not have her phone because Defendant had locked it up in the computer room. She did not consider using the land line at the house because it was too dark to see anything and because the phones were always moved and not necessarily on the chargers. Victim did not know what to do and was scared that Defendant might hurt her or her sisters, so she went back in the room and to bed where she stayed awake the rest of the night.

{7}      Victim's mother picked Victim and her sisters up on Sunday morning. She took her daughters to McDonald's for breakfast, and afterwards, Victim told her mother that she needed to go home rather than going straight to run errands as her mother had planned. When she got home, Victim ran upstairs and hid behind her mother's bed, crying. Victim told her mother what Defendant had done and told her mother that she did not want anyone to know because she was scared.

{8}      Victim went to school on Monday morning and, at about 10:00 a.m., Victim's mother took Victim to the police department to make a report. In the interview, Victim told Detective Palos everything that she could remember. Shortly after the incident,

5

Victim started seeing a counselor and was still seeing the same counselor when she testified at trial.

{9} Victim's mother testified that when she picked her daughters up on the morning of April 18, 2010, the girls rushed outside, and she noticed that Victim was "extremely pale" and was "very disoriented, very zombie-like." Consistent with Victim's testimony, her mother testified that she took her daughters to McDonald's for breakfast and then went home because she knew something was seriously bothering Victim. When they got in the house, Victim ran upstairs, and her mother found her hiding by the corner of the bed just crying. Victim told her mother what had happened with Defendant, and her mother cried and held Victim for a long time. Afterwards, Victim's mother went outside for some air and then made a phone call to Defendant and told him that she needed to talk to him when he got back into town. Later that day, Defendant called Victim's mother and said, "Look, I know what you want to talk to me about, but I just want to let you know that it was an accident. And once I realized what I was doing, I stopped." Defendant had no further conversations with Victim's mother but sent her a few text messages, including one that said,

> If the shoe was on the other foot[,] I would give you the [benefit] of the doubt [until] I knew better. I understand your concern but [please] give me a chance to explain before you make your judgement.

{10} The next day, April 19th, Victim's mother picked Victim up from school between 9:00 a.m. and 10:00 a.m. and took her directly to the police department to file

6

a report. Victim's mother spoke to Detective Irma Palos, an investigator with the Las Cruces Police Department, and provided information, including Defendant's whereabouts, his cell phone number, and names and phone numbers of family members. She also gave her cell phone to Detective Palos to examine and photograph. After Victim's mother made the police report, neither she nor the girls had any further contact with Defendant.

{11}     Detective Palos testified that she conducted a safehouse interview with Victim and also interviewed her mother. Although Victim made a disclosure, Detective Palos decided that there was not enough to put her through a SANE examination because there was no physical injury and, therefore, there would not be any evidence that could be recovered.

{12}     Once the disclosure was made, Detective Palos attempted to contact Defendant. She called him at least once on April 19, 2010, and left him a voice mail message, and she followed up with several other phone calls. On April 20, 2010, Detective Palos left two more voice mail messages for Defendant. In addition, Detective Palos made other attempts to contact Defendant, including going to Elaine's home, but Elaine told the officers that she had not seen her brother since April 22, 2010.

{13}     Ultimately, Detective Palos obtained an arrest warrant for Defendant and entered it into the national crimes center and with the local crime stoppers. On about May 20, 2010, she asked for assistance from the U.S. Marshal's office in locating

Defendant because there had been no response to where he might be from the other sources. Defendant was arrested four months later on September 23, 2010, in Hidalgo County, Texas.

**{14}** We conclude that Victim, her mother, and Detective Palos testified in a manner that could lead a rational jury to conclude that Defendant committed each of the counts of CSPM and CSCM against Victim. *See, e.g.*, *State v. Delgado*, 1991-NMCA-064, ¶ 59, 112 N.M. 335, 815 P.2d 631 (holding that the victim's description of the incidents supplied sufficient evidence to support convictions for CSPM). In an effort to cast doubt on the jury's verdict, Defendant contends that his own testimony and the testimony of others could have supported a different result. For example, he argues that, contrary to Victim's testimony, Elaine testified that there is a telephone in nearly every room, and that others saw Victim behaving normally when she woke up on Sunday morning. He also states that Victim was angry at him for flirting with a grocery store cashier, that it was "[i]nexplicabl[e]" that Victim's mother did not contact the police until the next day, and that he turned himself in as soon as he learned about the outstanding arrest warrant from his mother. We disagree that any inconsistency in the testimony warrants reversal. *State v. Ortiz-Burciaga*, 1999-NMCA-146, ¶ 22, 128 N.M. 382, 993 P.2d 96 ("It is the exclusive province of the jury to resolve factual inconsistencies in testimony." (internal quotation marks and citation omitted)). Further, the question in this case is "not whether substantial evidence would

have supported an opposite result but whether such evidence supports the result reached." *State v. James*, 1989-NMCA-089, ¶ 11, 109 N.M. 278, 784 P.2d 1021. We hold that, under our standard of review, there was sufficient evidence to convict Defendant of the five counts charged against him.

**Double Jeopardy**

{15}    Defendant argues that the four charged convictions on two counts of second degree CSCM and two counts of third degree CSCM violate the state and federal constitutional guarantees against double jeopardy. *See generally Swafford v. State*, 1991-NMSC-043, ¶ 9, 112 N.M. 3, 810 P.2d 1223; *Herron v. State*, 1991-NMSC-012, ¶ 6, 111 N.M. 357, 805 P.2d 624. "Double jeopardy protects against multiple punishments for the same offense." *State v. Silvas*, 2015-NMSC-006, ¶ 8, 343 P.3d 616. The parties agree that this is a "unit of prosecution" case because Defendant was charged and convicted of four violations of CSCM based on a single statute. *See* § 30-9-13(B)(1), (C)(1). We review the constitutional question of whether there has been a double jeopardy violation de novo. *State v. Andazola*, 2003-NMCA-146, ¶ 14, 134 N.M. 710, 82 P.3d 77.

{16}    In *Herron*, our Supreme Court set forth the following factors to consider when determining whether one act is sufficiently distinct from another to permit multiple punishments: (1) the temporal proximity of the acts; (2) location and whether there was movement or repositioning of the victim; (3) the existence of an intervening

9

event; (4) the sequence of the acts; (5) the defendant's intent as evidenced by his conduct and utterances; and (6) the number of victims. 1991-NMSC-012, ¶ 15. "These are flexible factors intended to guide appellate courts in unit of prosecution analyses." *Haskins*, 2008-NMCA-086, ¶ 17 (internal quotation marks and citation omitted). "No single factor is controlling." *Id.* (internal quotation marks and citation omitted). Defendant contends that his acts of rubbing Victim's vagina beneath her clothing and kissing her bottom, and rubbing her vagina and bottom outside of her clothing constitute one sexual encounter, spanning a short period of time, with no separation in time or location, no intervening events, and a single course of conduct requiring that three of his four CSCM convictions be vacated. Alternatively, Defendant argues that, if we conclude there is a distinction between second and third degree CSCM (clothed as opposed to unclothed), one count of second degree CSCM and one count of third degree CSCM should be vacated.

{17}     We begin with Defendant's argument that the four charged touchings were one continuous event. Applying the *Herron* factors, we conclude that they were not. *See* 1991-NMSC-012, ¶ 15. Under the second factor, movement or repositioning of the victim, Victim testified that Defendant put his hand in her underwear and rubbed her vagina and bottom back and forth. Defendant took his hand out of Victim's pants, and Victim closed her legs. After she put her legs together, Defendant pried Victim's legs open, pulled down her pants, and started rubbing her vagina and bottom area again.

10

Victim's position was sufficiently distinct between the time she was clothed and unclothed to support a finding of separate offenses.

{18}     Moreover, under the third *Herron* factor, there was clearly an intervening event that weighs in favor of multiple punishments. Defendant's digital penetration of Victim after he had touched her vagina and bottom the first time and then the removal of Victim's pants constituted intervening events. With regard to the fourth factor, the sequencing of the acts, we note that "[t]he legislatively-protected interests under the CSCM statute are aimed at protecting the bodily integrity and personal safety of children. Great pain, embarrassment, psychological trauma, or humiliation may result from contact with intimate body parts as compared to contact with other parts of the body." *Haskins*, 2008-NMCA-086, ¶ 24 (alterations, internal quotation marks, and citation omitted). In defining "intimate parts," the CSCM statute lists five separate protected areas: the primary genital area, groin, buttocks, anus, and breast. Section 30-9-13(A). "Accordingly, the legislative intent was to protect the victim from intrusions to each enumerated part." *Haskins*, 2008-NMCA-086, ¶ 24 (internal quotation marks and citation omitted). Here, the fact that Victim was touched in separate locations on her body during the encounters—her vulva and her buttocks—contributes to a finding of separate offenses. *See id.* ¶ 19 (concluding that touching of separate locations on the body weighed in favor of multiple punishments). Accordingly, under the facts of this case, in light of the foregoing discussion of the other *Herron* factors, we hold that

11

there is a sufficient distinction between the second and third degree CSCM (clothed as opposed to unclothed) to sustain Defendant's convictions. We now turn to Defendant's alternative arguments that one count of second degree CSCM (unclothed) and one count of third degree CSCM (clothed) should be vacated.

{19}    We agree with Defendant's assertion that his two second degree CSCM convictions fall under one continuous course of conduct and cannot be counted as separate offenses. We also agree that his two third degree CSCM convictions fall under one continuous course of conduct and cannot be counted as separate offenses. This case is very similar to *State v. Ervin*, 2008-NMCA-016, 143 N.M. 493, 177 P.3d 1067. There, we concluded that, with no lapse in time, no intervening event, no repositioning of child, and with one intent to massage her body, the defendant's touching of child's breasts, buttocks, and vagina was one continuous course of conduct even though the defendant touched three different body parts. *Id.* ¶ 46. In light of our holding in *Ervin*, and applying the *Herron* factors to the facts of this case, Defendant's act of rubbing Victim's vulva and buttocks while clothed and then unclothed was one continuous course of conduct in each instance. Accordingly, we conclude that Defendant's convictions on two counts of second degree CSCM and two counts of third degree CSCM violate his right to be free from double jeopardy, and we remand to the district court for dismissal of one conviction of second degree CSCM and one conviction of third degree CSCM.

**CONCLUSION**

{20}     We hold that one of Defendant's convictions for second degree CSCM and one of Defendant's convictions for third degree CSCM were in violation of Defendant's right to be free from double jeopardy, and we reverse and remand to the district court for dismissal of one of the convictions for CSCM in the second degree and one of the convictions for CSCM in the third degree. We affirm on all of Defendant's remaining convictions.

{21}     **IT IS SO ORDERED.**

_____
**LINDA M. VANZI, Judge**

**WE CONCUR:**

_____
**JAMES J. WECHSLER, Judge**

_____
**JONATHAN B. SUTIN, Judge**

13